IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GHADA G.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 19 C 6306 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(I), 423, almost six years ago in August 2016. (Administrative Record (R.) 183-84). She claimed that she became disabled as of May 17, 2016, due to carpal tunnel syndrome, hyperlipidemia, migraines, depression, bladder instability, right lung mass, arm pain and numbness. (R. 183, 200). Over the next three years, the plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. Plaintiff filed suit two and a half years ago under 42 U.S.C. § 405(g) on September 20, 2019. The case was fully briefed as of August 13, 2020 (R. 29), and the parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) nine months later on May 11, 2021. [Dkt. #31]. It is the ALJ's decision that is before the court for review. *See* 20 C.F.R. §§404.955; 404.981. Plaintiff asks the court to remand the Commissioner's decision, while the Commissioner seeks an order affirming the

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

decision.

# I.

## A.

Plaintiff was born on June 6, 1969, making her 49 years old at the time of the ALJ's decision. (R. 183). She has a fairly good work history, working consistently from 2002 through 2016 as a cashier at Wal-Mart. (R. 195-96, 201). She has a 12th grade education, but that was in Iraq, and she cannot speak or understand spoken English; she can however, read English. (R. 39-40, 198). She traces her psychological problems to her experiences in the war between Iraq and Iran, which included being hit by shrapnel. (R. 44).

As already indicated, plaintiff applied for benefits five and a half years ago, and this case has been in federal court for two and a half years. As such, and as this case turns not so much on the medical evidence, but on the vocational evidence, we need not set out a tedious summary of the entire medical record. Instead, we shall focus on the parties' arguments and the few pieces of evidence pertinent to those arguments.

As it is, the medical record in this case is not large – at least not as these cases go. It covers about 760 pages (R. 309-1075), and that includes a large number of duplicate and triplicate records. As is often the case, very little of the medical record is relevant to whether the plaintiff can or cannot work. Indeed, the plaintiff cites just fifteen pages, mostly from a consultative exam and two checklists two of her treating physicians filled out. [Dkt. #13, at 10-13, citing R. 420, 413, 418, 508, 511, 526, 773, 790, 971, 1065-68, 1072-73].[2]

---

[2] In the main, plaintiff's brief cites and relies on her own allegations and so, it is worth repeating that a plaintiff's allegations about pain and limitations, alone, are not conclusive. *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020); 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not
(continued...)

2

As will be seen, the important medical evidence here pertains to plaintiff's vision and limitations due to her post-traumatic stress disorder and adjustment and depressive disorder.

**B.**

After an administrative hearing at which plaintiff, represented by counsel, testified through an interpreter; and a vocational expert testified, the ALJ determined the plaintiff had the following severe impairments: "Post-traumatic stress disorder (PTSD), adjustment disorder with depressed mood, right carpal tunnel syndrome, degenerative disc disease of the lumbar spine and migraine headaches." (R. 16). The ALJ judged plaintiff's additional impairments – asthma and hyperlipedemia – to be non-severe. (R. 16). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically considered the requirements for the Listings covering disorders of the spine (1.04), major dysfunction of joints (1.02), and (12.04). (R. 17). In understanding, remembering, or applying information, and adapting or managing oneself, the ALJ found the plaintiff had mild limitations. In interacting with others and concentrating, persisting, or

---

[2](...continued)
alone be conclusive evidence of disability...."); 20 C.F.R. § 404.1529(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled."). A plaintiff has to prove she is disabled with medical evidence. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011)("The claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity."); *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008) (noting that the claimant bears the burden of producing medical evidence sufficient to support a claim of disability). After all, it "is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so." *Bowen v. Yuckert*, 482 U.S. 137, 146, n. 5 (1987). See also 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled.").

maintaining pace, the ALJ found the plaintiff had moderate limitations. (R. 17-18).

The ALJ then determined that the plaintiff could perform light work with the following limitations:

> the plaintiff can occasionally climb ladders, ropes or scaffolds and can frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The plaintiff is limited to occasional exposure to unprotected heights and dangerous heavy moving machinery. She can frequently handle and fmger with the right upper extremity. The plaintiff can understand, remember, and carry out simple, routine tasks. The plaintiff can use judgment limited to simple work-related decisions and is limited to occasional interaction with supervisors, co-workers, and the general public.

(R. 18). The ALJ then reviewed plaintiff's allegations and found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 19). The ALJ summarized the medical evidence, noting that objective studies were normal or revealed only mild impairments" (R. 19-21).

As for medical opinions, the ALJ said that the opinions from the state agency reviewing physicians that the plaintiff could perform light work with some additional manipulative and environmental limitation were supported by the evidence as a whole but gave little weight to their findings that plaintiff had visual and pulmonary limitations as they were not supported by the record. (R. 22). The ALJ gave the reviewing psychologists' opinions that plaintiff retained the capacity to perform unskilled work and that she could respond appropriately supervisors, co-workers, and work with reduced interaction with the public with work changes introduced gradually partial weight, stating that the psychologists were impartial experts and evidence presented at the hearing level was consistent with their findings. (R. 22). The ALJ gave the opinions of plaintiff's treating

physician that plaintiff would be off-task for 30% of the day, had to lie down for one hour daily, could stand or walk less than one hour, and that she required thirty minute unscheduled breaks every two hours to elevate her legs about heart level little weight. The ALJ explained that the opinions were extreme compared to the medical evidence. (R. 22). The ALJ also gave little weight to the opinion of plaintiff's other treating physician that she would be off task 15% of the day, absent four days each month, and was unable to sustain employment for the same reason. (R. 22).

The ALJ then found, relying on the testimony of the vocational expert, that plaintiff could not perform her past relevant work as a retail sales clerk, but could perform other work that existed in significant numbers in the national economy. Examples of such work were: small parts assembler (DOT 706.684-022; 14,500 jobs); greeter (DOT 344.677-014; 20,000); cutter and paster (DOT 249.587-014; 22,800 jobs); address clerk (DOT 209.587-010; 66,600 jobs); and circuit board assembler (DOT 726.684-110; 29,000) . (R. 24). Accordingly, the ALJ found plaintiff not disabled, and not entitled to benefits under the Act. (R. 24).

## II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses.

5

*Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

The "substantial evidence" standard is a low hurdle to negotiate. *Biestek* , 139 S. Ct. at 1154; *Karr*, 989 F.3d at 511 (7th Cir. 2021). If reasonable minds could differ, the court must defer to the ALJ's weighing of the evidence. *Zoch*, 981 F.3d at 602. But, in the Seventh Circuit, the ALJ also has an obligation to build what is called in this Circuit an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Reynolds v. Kijakazi,* _F.4th_, (7th Cir. 2021); *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). Of course, this is a subjective standard making it more difficult for ALJs hoping to write acceptable decisions that stand up to judicial scrutiny when challenged. One cannot predict how much of a "bridge" an individual reviewer will require.

But, at the same time, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). Here, however, the court is unable to do that. As it happens, this is a case with "logical bridge" problems that the court cannot ignore.

### III.

### A.

Reviewing courts are supposed to apply a common-sense reading to the entirety of an ALJ's decision. *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). They "need not check . . . . common sense at the door." *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004). In that vein, here are two premises that should be self-evident: a person with bad vision can't do things like assemble small parts or circuit boards, and a person who cannot interact with the public more than a couple of hours a day cannot hold down a job greeting the public. That seems uncontroversial, and judges are not to leave common sense and human experience at the door. *Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010); *Simila v. Astrue*, 573 F.3d 503, 518 (7th Cir. 2009). But, a court has to reject both those snippets of common sense in order to affirm the ALJ's decision in this case.

We begin with the former premise, because the medical record shows that plaintiff's best corrected vision is 20/50, and also blurry. (R. 80, 99, 373, 420, 491, 894). The only mention the ALJ made of any potential issue in this obviously critical area was in her consideration of the state agency reviewing physicians opinions. Those doctors, after reviewing the medical record, said that

the plaintiff retained the capacity to perform light work, but could not perform work requiring "fine vision or abilities to deal w/precise or finely detailed or finely tooled items", noting that plaintiff's corrected vision was only 20/50. (R. 80, 99). The ALJ liked the part about being able to perform light work and said it was supported by the "evidence as a whole." (R. 22). But the ALJ apparently did not like the part about plaintiff being unable to see well enough to do fine work – or thought it insignificant – and gave it "little weight," explaining that the record "does not support that these impairments impose any functional limitations . . . ." (R. 22).

It is anything but clear what "little weight" meant, because the ALJ simply rejected the vision restriction completely. Of course, an ALJ can reject a medical opinion is it inconsistent with the record. *See, e.g., Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019); 20 CFR 404.1527(c)(4)("Consistency. Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). But, here, it would appear that the state agency doctors were more familiar with – or more attentive to – the record than the ALJ.

The plaintiff *does* have a functional limitation in visual acuity, and it is supported by the record. Indeed, the agency's own consultative examiner, Dr. Karri, measured plaintiff's *corrected* vision at 20/50. (R. 420). That level of vision might not rule out a lot of jobs, but the state agency reviewers certainly cannot be questioned – at least not without more than the dismissive explanation than the ALJ gave – on the point that this impairment rules out fine or precision work. Moreover, one of plaintiff's treating physicians, Dr. Vassalo, repeatedly noted that plaintiff had "impaired vison/wears glasses (blurry vision/dryness ). (R. 373 (August 8, 2016); R. 491 (November 7, 2016); R. 894 (April 6. 2017)). The ALJ did not even mention any of this evidence in her opinion. As it

is contrary to her findings and contrary to her reasoning for rejecting the state agency doctors' opinions, the ALJ couldn't simply ignore the evidence; she had to address it. *See Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014)("An ALJ need not mention every piece of medical evidence in her opinion, but she cannot ignore a line of evidence contrary to her conclusion."); *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir.2012).[3]

The ALJ's failure to discuss – or perhaps even see – the visual acuity evidence is significant here because of the vocational expert's testimony at the administrative hearing. In response to the ALJ's hypotheticals covering plaintiff's physical and mental limitations – but not visual limitations, the vocational expert offered five examples of jobs the plaintiff could perform: small parts assembler, greeter, cutter and paster, address clerk, and circuit board assembler. It turns out that's not a good list for someone with 20/50 vision or blurry vision, as the vocational expert conceded when the plaintiff's attorney questioned her:

> Q: . . . The narrative state claimant has 20/50 visual acuity bilaterally. Avoid jobs requiring fine vision or ability to deal with precise or finely tooled and detailed small items. Are any of the occupations affected by that limitation?
> A: Yes.
>
> Q: The circuit board assembler requires fine vision?
>
> A: Yes.
>
> Q: What other occupations would be affected if we were modifying Hypothetical Numbers One and Three where the judge is giving light then sedentary?

---

[3] While it is true, as the Commissioner argues in her brief, that there are another handful of instances where different treating doctors noted that fundoscopic exams were normal, the ALJ didn't mention any of this evidence either, and our review is confined to the rationale the ALJ provides in her opinion. *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018); *Hardy v. Berryhill*, 908 F.3d 309, 313 (7th Cir. 2018). Additionally, normal fundoscopic readings do not necessarily rule out a loss of visual acuity. The examination is designed for other purposes, as the text the Commissioner cites to indicates. https://www.ncbi.nlm.nih.gov/books/NBK221/.

> A: Yes, those positions would be affected.
>
> Q: Would they be eliminated?
>
> A: Yes

(R. 60-61). It's fairly obvious that a vision impairment would rule out jobs like the small parts assembler, cutter and paster, address clerk, and circuit board assembler jobs, but the vocational expert also seems to indicate it would rule out the greeter job as well. That's not so obvious. But if the vocational expert was perhaps mistaken about the greeter job in terms of visual acuity, she – or perhaps the ALJ[4] – was definitely mistaken that the plaintiff – with the residual functional capacity as found by the ALJ – could do that work either. That brings us to our latter premise.

The ALJ found that plaintiff was limited to only occasional interaction with supervisors, co-workers, and the general public. (R. 18). A greeter who can only greet up to one-third of every workday is not really a greeter – that's just common sense. The Dictionary of Occupational Titles actually categorizes the job the vocational expert cited as "greeter" (DOT 344.677-014) as "usher." And, as everyone would expect, the job is all about dealing with the public:

> Assists patrons at entertainment events to find seats, search for lost articles, and locate facilities, such as restrooms and telephones. Distributes programs to patrons. Assists other workers to change advertising display.

https://occupationalinfo.org/34/344677014.html. The most important work activity for the job is "[p]erforming for people or dealing directly with the public, including serving persons in restaurants and stores, and receiving clients or guests." The most important work element for the job is "[d]eal[ing] with external customers (e.g., retail sales) or the public in general." https://occupationalinfo.org/onet/68021.html. It's safe to say that a person who is restricted to no

---

[4] The ALJ and the vocational expert appear to have crossed each other up at the hearing as the ALJ added, and took away, pieces of her hypothetical. (R. 56-58).

more than occasional interaction with the public cannot do this type of job. And that means there are no examples of work the plaintiff can perform that are supported by substantial evidence.

**B.**

Accordingly, this case must be remanded to the Commissioner; but it is perhaps worthwhile to address one of the plaintiff's other criticism of the ALJ's decision: the ever-popular subject of concentration, persistence, and pace. The issue comes up with such persistence and pace, that courts have taken to calling it "CPP." In this case, as already noted, the ALJ found that the plaintiff had a moderate restriction in her ability to maintain concentration, persistence and pace. The ALJ indicated that the finding was drawn from the opinions of the two state agency reviewing psychologists (R. 17), who both found: "Difficulties in Maintaining Concentration, Persistence, or Pace: Moderate." (R. 76-77). The ALJ also drew her residual functional capacity finding, in large part, from, those opinions as well. Both psychologists determined that plaintiff:

> could maintain concentration, persistence and pace to carry out short and simple instructions, and was not significantly limited in her ability to perform activites within a schedule and maintain attendance, or sustain an ordinary routine. But she was moderately limited in carrying out detailed instruction, maintaining CPP for extended periods of time. . . . She could perform work involving simple 1-2 step tasks on a sustained basis . . . including the abilities to understand, carry out and remember simple instructions.

(R. 81, 83, 101-02).

The ALJ gave only partial weight to the reviewing psychologist's opinions, saying that they were impartial experts with Social Security Disability program knowledge and experience, and that additional evidence available at the hearing level was consistent with their findings. (R. 22). It's not entirely clear what constitutes "partial" weight, but the ALJ translated the reviewing psychologists' opinions into a limitation to "unskilled work." (R. 22). More specifically, the ALJ determined that

11

the plaintiff "can understand, remember, and carry out simple, routine tasks. The [plaintiff] can use judgment limited to simple work-related decisions . . . ." (R. 18). And the hypothetical she posed to the vocational expert was the same, including the ability "to understand, remember, and carry out simple routine tasks. Simple work-related decisions." (R. 56). The ALJ either rejected the reviewing psychologists' restriction to "1-2 step tasks", or thought "simple routine tasks" was a close enough approximation.

The issue, as it repeatedly is in these cases, is how did the ALJ get from the evidence to the hypothetical and residual functional capacity? The plaintiff has two issues: the first is with the fact that the ALJ didn't use the phrase "moderation limitation in CPP", opting instead for language similar to that employed by the reviewing psychologists: "understand, remember, and carry out simple routine tasks. Simple work-related decisions." (R. 56). The plaintiff argues that the evidence shows that a moderate restriction on CPP means an individual will be off task more than 15% of the time and that would rule out all work. [Dkt. #13, at 4-6]. But, as it turns out, that was plaintiff's counsel's own supposition.

> Plaintiff's counsel questioned the vocational expert as follows:
>
> Q: There is also limitation in terms of according to DDS, they found moderate limitations in concentration and attention. Is that a vocational profile that would allow you to discuss with the number of occupations or whether an occupation could exist if the individual had a moderate level of concentration and attention?
>
> A: Yes, that also goes into off task time.
>
> Q: Is there any way that you relate moderate limitations to in attention and concentration to being off task?
>
> A: If they aren't able, if they have those limitations, most likely, they'll be off task.
>
> Q: If moderate limitations in attention, concentration means they would be off task more than the 15 percent parameter that you set forth in your answers, that therefore,

>no occupations would exist?
>
>A: Yes.

(R. 61-62). So, it was in fact plaintiff's attorney who asserted the proposition that moderate restriction on CPP meant an individual would be off task more than the allowable 15%. In fact, as the Seventh Circuit has recently acknowledged:

>A "moderate limitation" is defined by regulation to mean that functioning in that area is "fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1. As the Commissioner points out, "fair" in ordinary usage does not mean "bad" or "inadequate." So a "moderate" limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace.

*Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021).[5] So, there was no problem with the ALJ failing to specifically say "moderate" to the vocational expert or in her residual functional capacity finding in this case.

But plaintiff has another issue, and that concerns the ALJ discarding the reviewing psychologists' restriction to "1-2 step tasks." [Dkt. # 13, at 5]. This does present a problem because, unlike plaintiff's argument on the moderate CPP restriction, there is evidence, directly from the vocational expert, that a limitation to simple 1-2 step tasks:

>Q: In hypothetical number one, the judge gave limitation of limiting the hypothetical individual to simple, routine, and repetitive tasks?
>
>A: Yes.

---

[5] Previously, the Seventh Circuit expressed a somewhat different view on this issue, which would seem to account for the plaintiff raising this argument here. *See, e.g., O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698–99 (7th Cir. 2016)("Agency regulations, as far as we can tell, do not quantify what is meant by a "moderate" restriction, but the regulations do instruct ALJs to rate the degree of limitation on a 5-point scale of none, mild, moderate, marked, and extreme. See 20 C.F.R. § 404.1520a. If a moderate impairment on maintaining concentration, persistence, and pace equates to being off task at least 15% of the time then, according to the vocational expert, [plaintiff] is essentially unemployable.")

> Q: If we define that in terms of how DDS defined it in their determination explanation as 1-2 steps, do these occupations exist?
>
> A: In my professional experience, no.

(R. 62). This, then, is another case where the ALJ did not adequately account for the plaintiff's limitations in her hypothetical or residual functional capacity finding. As the Commissioner points out [Dkt. # 24, at 7-8], it is generally alright when an ALJ draws her hypothetical/residual functional capacity finding directly from the opinions of the state agency reviewing doctors. *See, e.g., Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019); *Baldwin v. Berryhill*, 746 F. App'x 580, 584 (7th Cir. 2018). But the ALJ didn't do that here. She rejected the limitation to "simple 1-2 step tasks" and didn't explain why. That has to be addressed on remand as well.

Additionally, the plaintiff argues that there is medical evidence that supports her being off task anywhere from 15 to 30% of the time. She relies in the main on the medical opinion checklists two of her treating physicians – Drs. Mikesell and Bikhra –filled out for her attorney. [Dkt. # 13, at 7-12]. The opinion from Dr. Mikesell is dated June 14, 2018, and reported plaintiff's limitations resulting from her migraines. The doctor said depression and anxiety exacerbated plaintiff's condition. He felt that plaintiff's symptoms would frequently interfere with her concentration. (R. 1072). He thought that she would be off task 15% of the time and miss 4 days of work a month. (R. 1072). The ALJ gave Dr. Mikesell's opinion little weight, explaining that it was not consistent with the medical record. (R. 22).

On June 4, 2018, Dr. Brikha gave an opinion of plaintiff's limitations as a result of diagnoses of migraines, asthma, and adjustment disorder with depressed mood. He said depression and anxiety exacerbated plaintiff's physical symptoms. He said her pain would frequently interfere with her

ability to concentrate; her stress would constantly interfere. (R. 1065). Confusingly, Dr. Brikha said that plaintiff had to lie down for 2 hours and 30 minutes "at one time" before getting up; but only had to lie down for 1 hour during an eight-hour workday. (R. 1066). He added that plaintiff could sit for one hour, total, in a workday and stand for no more than one hour. (R. 1066). The doctor further confused the issue by saying that plaintiff had to have a break every 2 hours for 30 minutes, but would *not* need to lie down. (R. 1067). Dr. Brikha estimated that plaintiff would be off task 30% of the time, and would be absent from work 3 days a month. (R. 1068). His opinion was essentially unchanged from June 11, 2016. (R. 508-11). The ALJ gave Dr. Brikha's opinion little weight because it was extreme in light of the objective medical evidence. (R. 22).[6]

The plaintiff complains that ALJ gave the two opinions "sparse treatment" and failed to meet the standards for considering medical opinions. [Dkt. #13, at 12]. It's not clear what the plaintiff means by sparse. While there are a number of factors ALJs should consider when assessing a medical opinion, they don't have to recite them chapter and verse. *Henke v. Astrue*, 498 F. App'x 636, 639 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413, 415 (7th Cir. 2008). As for the ALJ's rationale for rejecting these to opinions, it was entirely valid. The ALJ's opinion set forth a number of entries in the medical record – including reports from both Drs. Brikha and Mikesell that plaintiff had normal – or no reported issues with – memory, attention, and

---

[6] Dr. Brikha's internally inconsistent opinion is a good example of why an opinion from a doctor is often of little value when they "expressed [their] opinion by checking boxes rather than explaining how medical evidence supported [their] conclusions." *Trottier v. Saul*, 809 F. App'x 326, 327 (7th Cir. 2020). *See also Urbanek v. Saul*, 796 F. App'x 910, 915 (7th Cir. 2019)(questioning persuasive value of a checklist opinion); *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015)(checklist observations are ... "less useful to an ALJ" than a doctor's narrative summary).

concentration[7], and generally normal physical examination findings.[8] (R. 17, 20, 21, 22). Obviously, a treating physician's opinion may be accorded less weight if it is inconsistent with the other medical evidence or the doctor's own treatment notes. *Pavlicek*, 994 F.3d at 781; *Zoch*, 981 F.3d at 602; *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019); *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016).

Given the record, there was nothing wrong with how the ALJ assessed the opinions from the plaintiff's treating physicians. But, as this matter is being remanded, it must be said that the ALJ's characterization of Dr. Fine's consultative exam report was dismissive and somewhat misleading. The ALJ summarized Dr. Fine's report as noting that plaintiff's English was "poor but up to the task, that her answers were relevant to the conversation, and that her cooperation and behavior were appropriate. (R. 21). But, the ALJ certainly glossed over the gist of that report in which the doctor indicated that plaintiff had a fixed depressed mood, immediate and recent memory deficit, poor fund of information, problems calculating, and problems with judgment. The doctor also questioned

---

[7] January 28, 2016: memory, attention . . . were normal. (R. 338); May 17, 2016: memory, attention . . . were normal (R. 335); June 2, 2016: memory, attention . . . were normal (R. 331); June 9, 2016: normal mood and affect, normal attention span and concentration (R. 389); November 28, 2016: depressed affect, no mention of concentration deficit (R. 971); January 12, 2017: depressed affect, no mention of concentration deficit (R. 975); April 8, 2017: depressed affect, no mention of concentration deficit (R. 980); September 18, 2017: depressed affect, no mention of concentration deficit (R. 988); January 8, 2018: depressed affect, no mention of concentration deficit (R. 997).

[8] May 20, 2014 (Dr. Mikesell): plaintiff reported that Sumatriptan was generally effective with a single dose approximately 30% of the time and 70% effective after taking two tablets. (R. 340); September 26, 2014 (Dr. Mikesell): migraines were under good control (R. 444); September 2014 EMG/NCS: normal with no neurophysiologic evidence of neuropathy, myopathy, brachial plexopathy, or cervical radiculopathy affecting the right upper extremity (R. 435-37); February 19, 2016 MRI: *mild* degenerative disc disease at L5-S1 (R. 466); June 2, 2016: examination revealed normal muscle strength and tone throughout, normal reflexes and sensation, and normal coordination and gait. (R. 331); January 2017 lumbar x-rays: multilevel disc degeneration and spondylosis, but no acute abnormality; cervical and thoracic spinal x-rays were normal (R. 696-97); February 2, 2017: no coordination deficits, intact balance, and a normal gait (R. 958); February 6, 2018: normal muscle tone, normal reflexes and sensation, normal coordination and balance, and a normal gait (R. 927).

whether the plaintiff would be competent to handle her own funds if she were granted benefits. (R. 418). An ALJ can't simply ignore those portions of a report that detract from her ultimate conclusion. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021); *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020).

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment [Dkt. #12] is granted, the defendant's motion for summary judgment [Dkt. #23] is denied, and this case is remanded to the Commissioner for further proceedings.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 2/25/22